Your honors, may it please the court, my name is Tom O'Malley and I represent the appellant, Julius Lawson, in this case. Your honors, I'd like to begin by addressing the Brady violation that was the third issue that was briefed in this case. Your honor, the purpose of the Brady material would have served a threefold, would have served a threefold purpose. Number one, instead of starting in the middle of your case, why don't you tell the court what your case is, what the issue is, right? Yes, your honor. Your honor, the case is about the attempted robbery of a post office in Fort Wayne on December 12th, or December 19th, 2012. The jury found in favor of the government on all three counts. We have issued an appeal, or we appealed this case on the basis that there was insufficient evidence to support the jury's verdict on the use of a firearm during the course of the robbery. There were two robberies. Robber number one is alleged to be my client, Julius Lawson. It's uncontested that Lawson did not carry a firearm into the post office. It was the second robber who did. So the sufficiency of the whether there was a firearm or not is the first issue that was briefed. There was one witness who identified a possible firearm. Well, she was the only one in the lobby that had the whatever was stuck in her stomach, right? That is correct, your honor. At the point that the alleged weapon was stuck into her side, I believe my client, if he was my client, was at the post office counter with his back to her. She could not identify it as a firearm. She said it may have been a stage prop, which we presented her with a stage prop. That possibility exists in any armed robbery. Pardon me, your honor? That possibility exists in any armed robbery. If I recall, a famous criminal used a carbine gun out of a But your honor, in this case, the government had any number of inspectors and investigators and people that could review the videotape. None could say whether a firearm was used. Indeed, Miss Hunter, who was the victim, stated she didn't know if it was a BB gun, a prop, a stage prop, or a firearm. She was willing to agree that it's a I thought she thought it was a Cobra of .380. She said it looked like that, your honor. Her father-in-law had one. And your theory is what? That it was a mock Cobra? An imitation of it, but not actually a weapon? My theory is that there's never been proof beyond a reasonable doubt what that object was, your honor. Whatever it was, it looked like a Cobra. To her, your honor, it did. So what do you think it was? Your honor, I have no idea what it was because the victim herself doesn't know whether it was a BB gun, a stage prop. Well, she thinks it was a Cobra. Now, is it your theory that it is an imitation of a Cobra? Your honor, my theory is that it well could have been an imitation of a Cobra, but my real relevant theory is that there's no proof beyond a reasonable doubt. Well, if you think it's an imitation of a Cobra, have you presented evidence about what Cobra look-alikes look like? Yes, your honor. We presented her with a stage prop at trial that had a three-and-a-half-inch barrel the same length as a Cobra, and it was not a revolver. It was a slide-type weapon, a prop weapon. She could not identify whether... She said it looked like that, too. So, in fact, your honor, where you asked the question... What would prevent that from nullifying prosecution in all cases involving a gun? That is, isn't it always possible to find, or I suppose you could construct, a look-alike and show it to the witness and say, well, how do you know it wasn't this fake gun? Your honor, you could do that, I suppose. Well, I think if you won the case that we would have a flood of such cases, right? I don't know, your honor, because, number one, the weapon could be retrieved. Number two, ATF experts could have, if possible, examined the videotape and clearly identified it, beyond a reasonable doubt, as a weapon. But in this case, he's entitled to have the elements of the charge proved against him beyond a reasonable doubt, and it's our position that was never done. Well, yeah, but ATF experts, particularly on this kind of videotape, can they tell a very well-designed mock gun or a pellet gun? You can't do that. I don't know, your honor. I know in this case they could not. Why does it matter? It matters, your honor, because the second charge, the 924C charge, requires the use of a firearm. And if this was a stage prop, it was not a firearm, and therefore seven years of Mr. Lawson's sentence would have to be removed. What makes you think a firearm is just something that fires? What if it were a real gun, but it couldn't fire? Maybe the firing pin had fallen off or something. How would you classify that? Is that a firearm? That would not be a firearm under the statutory definition of it, your honor. What's the statutory definition? It's in the brief, your honor, but it is—I'm sorry, I don't have it available, your honor. I can look it up during my opponent's presentation. I don't have it available right at the moment, your honor. If it were empty, would it still be a firearm or not? No bullets in it. If there were no bullets in it, it would still be a firearm, yes, your honor. It meets the definition, and it's the capability to fire under—I believe it requires an explosion within the weapon. I'd leap to something else if I were you before the next question comes in. Yes, your honor. Your honor, on the issue of the Brady material, the—I'm into my rebuttal time, but I would just say that we feel the Brady material served the purpose of— try to rob with a fake gun. It's, of course, if the—if your potential victim had a real gun, he'd be in very serious trouble. It would be, your honor. I question whether it would be any more risky than robbery with a real gun. They both involve inherent dangers. I know you're into your rebuttal time, but how could you lose under the Brady violation you're discussing? They gave you a five-day break to look into the material once it was turned over. Yes, your honor. Well, first, the government cannot arrogate to itself the determination of what is and what is not Brady material. Besides, why is it harmless there? If it had, your honor, we could have found what the government's policy is on offering witnesses money, when that is to be offered. We could have done discovery on when Inspector Gottlieb had previously offered witnesses money. As to Officer Rogers, we could have gone into the people that were involved in the accidents he had while driving his police vehicle. We could have found out if he was by nature a careless and reckless individual, which would have certainly affected the quality and the integrity of the fingerprints he lifted, if he had been so reckless. Save yourself a visitor, too. Thank you, your honor. Okay. Thank you, Mr. Formale. Mr. Holler? Thank you. Good morning, your honor. And may it please the court, there was sufficient evidence to find that a firearm was used here and no Brady violations would justify reversing the verdict in this case. Dealing first with the sufficiency issue in response to this court's questions, the definition of a firearm for purposes of count two is in 18 U.S.C. 921A3A. It's any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive. An unloaded gun would count. Something with the firing pin broken but that was originally designed, that would count. But the courts have said, for purposes of the definition of a firearm, that a toy or a butane lighter that's not really a firearm, those kinds of things, those don't count as a firearm. They may count as a dangerous weapon for purposes of count one and three, but they would not count as a firearm. But the courts have also consistently said, and we've tried to include in the brief cases from this circuit and many, many other circuits, you don't have to recover the firearm for a jury to use its common sense and use its inferences and some of the same inferences that the panel has discussed with Mr. O'Malley to decide that it can conclude, based on all the facts, that this was an actual firearm. The facts of this case where the firearm was displayed for a lengthy period of time, where it was pointed directly at the woman's stomach, where she felt it against the back of her head, are not terribly consistent with a fake, low-weight, toy, plastic firearm. And, Your Honor, I think the jury could make those conclusions in this case. Ms. Hunter testified on direct examination. This looked like a Cobra 380. She knew what a Cobra 380 was because her father-in-law owned one, and she saw the gun for a period of time, and that's what she thought it was. Now, Mr. O'Malley, very good defense attorney, comes in and finds a gun, finds a prop gun that looks very similar, but there's no reason to think that that's some kind of easily accessible gun on this record that the defendant would have had or would have wanted to have. And, Your Honor, the cross-examination, I understand exactly what she said, but this was a woman who had been robbed at gunpoint and terrified out of her life four months before, and he brings in a gun that looks very similar to it, tries to hand it to her, tries to get right up next to her with the gun, and I think she had a bit of a flashback, to be honest. And so I don't think the jury had to give credit to her answers when she was that terrified. I think she wanted the gun to go away, to be honest. What is the prop gun made of? You know, you might have to ask Mr. O'Malley because I was not trial counsel. I think it's made of some sort of lightweight polymer-type material. They're usually lighter, but I don't know what exact gun. I haven't seen it. I think it's in the record, so it may still be in Fort Wayne, but it could be sent up if the court wants to look at it and review it. The jury could have reviewed it as well. But they had to make that determination. I think if you look at the survey of the cases, I don't dispute that there are cases, a few, not a lot, but a few over the years, and the defendant correctly cites to them, where toy guns are used. I would submit if you actually look closely at those cases, in most of those cases, there are cases where the prop gun is hidden under a jacket, very briefly flashed, because if you very briefly look at something, oh, that's probably a gun. But if you actually have it out for a period of time, the longer the gun is exposed, the more likely somebody is going to look at that and go, well, wait a minute. That's not really a gun. I know that's not a gun. But for a few seconds, you could fool someone. But if you're actually showing it and using it and displaying it over a period of time, it's much less likely. That and the general likelihood is it is going to be far more common to use a real gun. Well, there are certain levels. For example, you can have a gun that's fired at blanks. Right, right. Like a starter's pistol, still fires. It does. I think I'd have to go back and look at the A3A definition. I know in some instances starter pistols count. I'm not sure if it does count for firearm purposes. Well, it doesn't have a projectile. Right, so it's a dangerous weapon, but I think it's not a firearm. So that, of course, falls back to our alternate argument. But for all those reasons, Your Honor, I think this Court should recognize this is a quintessential jury question. It's been recognized that way every time it's come up in all of the cases, and it should be recognized that way here. This is what the jury was tasked to determine. They could look at the video. They could look at the guns. They could see the witness, and they could make a decision based on all the evidence. Is it a reasonable likelihood that this is what it is? Or when the witness says, or when the robber says, I have a gun, that incarries an implicit threat to use the gun, and it makes their life difficult. Has there ever been a study of any sort of how frequently a fake gun is used in crime relative to real guns? I did ask the Department of Justice librarians to look into that. We did not find anything. So I am not aware of one, Your Honor. I think it is all anecdotal. It might be something that in the future someone, you know, either the government or the National Association of Criminal Defense Attorneys might want to look into, if this proves common. I mean, I think it occurs. I don't know that it occurs all that regularly. I think for the most part, robbers either want to go in with a real weapon, and they really are going for the armed robbery, or they want to go in with a note, and they want to make this kind of a, I have a gun. You know, they might threaten to have a gun, but they don't even want to have one on their person, because they don't want to risk that somebody is going to see their fake gun and start shooting, and they've got no way to shoot back. That's my sense, but I admit to you, I don't have studies. I don't have anything to back that up, and I'm not aware of any that exist. We couldn't find any, but they may be. Are there cases where someone has been acquitted when there was disagreement between the prosecution and the defense as to whether it was a real gun? I didn't really come across any of those cases, but I mean, those probably wouldn't have happened. You don't research not-guilties? Yeah, those are the not-guilties. I'm not aware of any in our district or anything, anecdotally, just talking to other prosecutors. I mean, I'm sure it has happened. The jury, this was, his main argument, I'm sorry, Mr. Lawson's main argument in defense was alibi. It wasn't me, but his second argument, his second-tier argument was it's not a firearm. You can't prove, and he went through the definition. He went through all of this information, and the jury rejected it, and the jury, you know, I mean, this wasn't overwhelming evidence on the firearm. The jury could have decided, you know, we're just not sure. They could have come to that conclusion, and I'm sure that some juries do. So it doesn't strike me as something that- Well, the jury, in effect, believed what the witness said. The jury believed the witness, what she said on direct. Yeah, they believed what she said on direct, and whatever doubts she harbored didn't overcome their doubts. I would like to turn to the Brady issue since that was also raised, and, Your Honor, Judge Bower, you are correct. This was harmless. The district judge was appropriately outraged that this videotape was not turned over and gave the defendant almost everything that he wanted. He got five days to review the tape. All of the things that he's saying he wanted, he could have done. He could have called more witnesses. He could have done anything he wanted to do. If he'd wanted to take more time, If he'd said, I want to take more time to find out more information about Gottfried, I mean, Gottfried would have been duty-bound to provide information on any other times that he had made statements like this. He never asked for that. He didn't file any kind of post-trial motion re-raising any of these issues. So on this record, in light of this evidence, there's just no reason to believe that. I mean, the video itself, you can see the phone. You can see the palm on the counter. You can see the phone fall out of his pocket and be left when he leaves. And you can see the phone records that come from the phone company that show when various phone calls were being made by Violet Hansen, the girlfriend to Mr. Lawson. And all of that evidence combined was more than enough for the jury to convict here. The defendant's theory essentially seems to be either that, well, the government planted all this and this video alone is sort of a tape statement is enough alone to prove that, which seems to me to be a fairly weak argument and one the jury was entitled to reject, or that somehow this shows some kind of negligence on the government's part and somehow these fingerprints, you know, through some kind of negligence, these fingerprints miraculously appeared that shouldn't have otherwise, which again just logically doesn't make any particular sense. So, again, in light of those issues, the Brady evidence was not suppressed. If the defendant has sufficient time to make reasonable use of it at trial, then for purposes of Brady, the evidence is not suppressed. The Hansen videotape is not suppressed. And as far as Detective Rogers' improper conduct, in 1998 and 2004, this unspecified conduct, we don't even know what it was, years before, the thought that there's any reasonable likelihood that that evidence would have somehow turned the tables here when all that Rogers did was say, I found this phone on the counter, which other people confirmed. You know, I found this fingerprint on the counter and somebody in Dulles, Virginia, who's never been to Fort Wayne, Indiana before in his life, confirmed that that matches these fingerprints. It's not, it's not, there's really no reason to think that the jury would have returned a different verdict. I mean, at a minimum, the standard of review here is abuse of discretion. Judge Springman was there. She observed the trial. She was in the best position to determine whether this had any particular effect and impact. And her ruling, I believe, is solid and certainly not an abuse of her discretion. If the court has questions about the Rosemond issue or anything else, I'm happy to answer them. But otherwise, I would rest on the brief on that. Okay, thank you, Mr. Haller. Thank you. Mr. O'Malley, anything further? Yes, Your Honor. Your Honor, respectfully, regarding Mr. Haller's comments about what thought process that Miss Hunter, the victim, went through while on the stand is pure speculation, obviously. Your proposition seems to be that there can never be a conviction in a case, a gun robbery case, in which the gun is not found. Your Honor? Your view is you can never prove beyond a reasonable doubt that the gun was not a skillful fake. Well, Your Honor, in this case, that is not my theory. You tell me a case in which if the gun is missing, the defendant nevertheless can be convicted. Your Honor, there are ways to do that. There are ways for people to look at photographs, to look at video evidence. In this case, Miss Hunter, who claimed to have knowledge. What do you mean photographs and video evidence? To properly identify whether it is indeed, say, a Cobra 380 or a Taurus or some other type of weapon. Well, there may not be a photograph of what he was carrying, right? Correct, Your Honor. There may not be. And if there isn't, then I don't understand how you think the government could ever convict someone beyond a reasonable doubt. Well, I don't know about ever, Your Honor, but I do know in this case. Not ever. You give me a case where there's no photograph. I don't even know what the photograph would do if it's a skillful reproduction. I can't give you such a case, Your Honor. Well, suppose there were a photograph, a video in a bank or something like that. And it shows this person carrying what looks like a real gun. Only, there may well be a fake that looks just like it, right? Yes, Your Honor. Yes. Then on your theory, you could not, if the gun was not found, you could not convict this person of using a gun beyond a reasonable doubt. You could not convict them of using a firearm under that theory. Pardon? You could not convict them of using a firearm. You could convict them of using a dangerous weapon. That wouldn't bother you, would it, Mr. O'Malley? It would bother me, Your Honor. Only if you were the victim. Intelligent criminal, before acquiring a gun, he would look in, he would Google cobra fakes. Have you tried doing that? I have, Your Honor. Yeah. Well, you see a great number of pictures of these fakes, which look like the real thing. So, in your view of criminal law, as I say, there would never again be a conviction in a case in which the gun had not been found. That is somewhat incorrect, Your Honor, because as you have ruled on numerous occasions, replicas are dangerous weapons. And in that case, you could get a conviction on a dangerous weapon. How can a replica be a dangerous weapon? Because it scares people? The Seventh Circuit has ruled that, yes, Your Honor. Not because it scares people, but because it increases the likelihood of violence. Only violence against the person holding it. Why, we don't care about that, surely. Well, you've ruled that way, Your Honor, that it is a dangerous weapon. I'm sorry, I can't cite the case. It's not a firearm? Not a firearm, that's correct. Well, was this, you think this might have been a fake? Yes, Your Honor. Well, how would that have affected his punishment? It would have negated the conviction on the 924C, Your Honor. Well, what would he be convicted of? He would have been convicted on count one of using a dangerous weapon. And what's the difference in punishments? Well, one requires an enhancement of, I believe, four levels to the underlying offense when you can calculate the offense level. And that will, and the other, Your Honor, will, the seven-year... The other being the dangerous weapon? Yes, Your Honor. And that's how many? I believe it's an enhancement of four offense levels, Your Honor, under the guidelines. Well, you just said four. I thought you were talking about the real gun. No, a firearm is the 924C, which requires a five-, seven-, or ten-year mandatory sentence. Okay, so if it's a real firearm, it's a minimum of five years? Yes, Your Honor. And if it's just a dangerous weapon, it's what? Then the enhancement to the underlying offense level. Then what is the minimum sentence if it's a dangerous weapon? There is no minimum, Your Honor. There's no minimum? No, there's an enhancement to the offense level. Well, that's very nice. So, in your world, there are going to be lots of cases in which a real firearm is used, but the conviction will be for use of a dangerous weapon. I think that's a misstatement, Your Honor. No, it's not a misstatement. In my world, Your Honor, the 924C would have to be proven beyond a reasonable doubt. Yes, and it couldn't be proven if there was a plausible fake, and the real gun and whatever he used had been lost. Respectfully, Your Honor, then the legislature should change its definition of a firearm. Oh, so you agree with me. You just think, well, maybe they can change the law. Well, they could change the definition because the legislature defined it for us, Your Honor, and therefore it's incumbent on the government to prove that it meets the legislature's definition. Okay, but at least you're agreeing with the proposition that until there's legislative revision, you're driving a real hole into prosecution for armed robbery. I'm requiring the government to meet its burden of proof. That's all, Your Honor. Well, it comes down to the credibility of the witness, right? Yes. In this case. Yes. Okay, thank you very much. Thank you, Your Honor. Okay, and you were appointed, were you not? Yes. Well, we thank you for your efforts on behalf of your client.